McEvers v. Steamboat Sangamon.

----◄●●►----

McEvers, Respondent, v. Steamboat Sangamon, Appellant.

1. A barge was hired of A. by a steamboat, and it was agreed in writing that on the giving of notice the barge should·be delivered up to A., "with the understanding that if froze up in the ice the sum above mentioned (eight dollars per day) is not to be paid, but only for the time the barge is in actual service, subject to his order, by giving notice one trip previous to leaving port, and is to be delivered in good order, the usual wear and tear excepted." The barge was destroyed by the ice in the Mississippi, without

McEvers v. Steamboat Sangamon.

fault on the part of the defendant. *Held,* that the steamboat was not liable on the contract for the non-delivery of the barge. Whether the steamboat assumed the obligation to return the barge at all events, and notwithstanding any overpowering force, is a question of intent, to be determined by a proper construction of the terms of the contract. (SCOTT, J., dissenting.)

### *Appeal from St. Louis Circuit Court.*

This was an action brought by McEvers upon the following instrument of writing : " This is to certify that I have hired of Mr. T. L. McEvers his barge called the ' Lightfoot,' for the sum of eight dollars per day, and I am to deliver it to him at Montezuma, he paying for the towing of the same at the rate of thirty dollars, with the understanding that, if froze up in the ice, the sum above mentioned is not to be paid, but only for the time the barge is in actual service, subject to his order, by giving notice one trip previous to leaving port, and is to be delivered in good order, the usual wear and tear excepted. St. Louis, December 20th, 1853. Steamboat Sangamon, L. A. Calvin, master, per C. N. Golding, clerk."

The breach assigned was the failure of defendant to deliver up the barge to plaintiff according to the terms of the contract. Upon the trial, evidence was offered on the part of defendant to show that the barge was lost by the breaking up of the ice in the Mississippi river, without any fault or negligence on the part of the officers or agents of defendant. This evidence was rejected, and, on the motion of plaintiff, the court gave the following instruction : " If the jury believe from the evidence that the agents of defendant hired the plaintiff's barge to be used in connection with defendant in navigating the waters of this state, that the agents of defendant took possession of the barge for the above use, and that the barge was sunk and lost by the ice in the Mississippi river, while in possession of defendant or his agents, plaintiff is entitled to recover."

There was a verdict for plaintiff, and defendant brings the case here by appeal.

*Hudson & Thomas,* for appellant. 1. The agreement given in evidence by plaintiff, imposed upon defendant the

same obligations the law imposes upon a bailee for hire. (Sto. on Bailm. § 33 and 36.) The agreement does not import an absolute agreement to return and deliver up the barge at all events. The parties did not intend that the defendant should be made liable as an insurer. Inevitable accident would relieve a bailee from the consequences of a failure to perform the agreement. (See The People v. Manning, 8 Cow. 297; Carpenter v. Stevens, 12 Wend. 589; The People v. Bartlett, 3 Hill, 570; 6 Mo. 323; 8 Mo. 33; 10 Mo. 568.)

*Reber*, with whom were *Hart & Jecko*, for respondent. The court properly rejected the evidence tending to show that the barge was destroyed by inevitable accident. (16 Mo. 484; Chitty on Con. 734.)

LEONARD, Judge, delivered the opinion of the court.

The steamboat Sangamon hired the plaintiff's barge (the contract being in writing) at eight dollars a day, excluding the time it might be frozen in the ice, to be returned to plaintiff at Montezuma at any time, upon reasonable previous notice, and " delivered in good order, the usual wear and tear excepted." The suit is for the non-delivery, pursuant to the contract; and one defence set up in the answer is, that the barge was destroyed by an overpowering force—the ice in the Mississippi river—without any fault on the part of the defendant. This defence was struck out upon the objection of the plaintiff, and proof to the same effect, offered by the defendant upon the trial, was excluded.

If there had been no obligation upon the boat for the return of the barge, other than what the law implied upon the bailment, from the transaction itself, this defence, it is admitted, would have been sufficient. But it is insisted that here the party imposed the duty upon himself by a special contract, and therefore took the risk of such casualties; the distinction being between a duty imposed by law and one imposed by the parties themselves. We are told that by the civil law, when a

person enters into an obligation to do a particular thing (unless it be of the essence of the contract, that a risk is incurred on the one side or the other), and is prevented from doing it by accident or an overpowering force, there is no ground for claiming damages for the non-performance. (Henderson v. Stone, 1 Martin, 641.) The object of both the civil and common law, in the matter, is to ascertain the intention of the parties, and execute their contracts accordingly. If it were the intention of the boat here to make itself responsible, in case the barge was destroyed without any fault, even by a natural force that could not be resisted, the matter relied upon would, of course, be no defence; but the question is, whether this was the intention. It is argued, however, that this is the interpretation our law gives to an undertaking for the performance of any particular act, and that the courts are bound to adhere to this construction, no matter what may be thought of the propriety of it, as a rule likely to carry into effect the real intention of parties. An examination of the cases, however, we think, will show that there is no such inexorable rule applicable indiscriminately to the construction of all special undertakings.

In Pollard v. Moffer, (1 Dall. 210,) the covenant was to deliver up the demised premises (a house in Philadelphia), at the end of the term, "in good repair," and the British army had taken and held the city of Philadelphia until after the term had expired, and, during the time, taken possession of the house and committed the waste and destruction complained of. This was admitted as a good defence to an action for not returning the premises in good repair pursuant to the contract.

In Young v. Bruces, (5 Littell's Rep. 324,) where there was a special contract to return a hired slave, the court of appeals in Kentucky decided that the death of the slave excused the non-delivery; following in this matter, the cases in Virginia. (Harris v. Nicholas, 5 Munf. 487.) In Perkens v. Reed, 8 Mo. 33, and Ellett v. Bobb, 6 Mo. 324, this court went still further and decided that when a hired slave ran away, without any fault on the part of the hirer, that the latter was excused,

and this decision corresponds with the decisions in Kentucky upon the same matter (Keas v. Yervell, 2 Dana, 249); and the ground upon which the latter decisions are put is, "that the casualty by which the slave is lost is a peril incident to the nature of such property, and, therefore, in contracts concerning it, that peril shall never be presumed to have been guarded against, unless so expressly stipulated."

It is true the hirer could not prevent the death in the first class of cases, nor the escape in the other class; yet, if his contract embraced these risks, he was bound to pay for the loss.   Both cases, therefore, go upon the ground that there is no such imperative rule of construction applicable to contracts of this description.

The question here then is, was this risk within the engagement of the defendant, so that, no matter how the loss occurred, the party is bound, and we think it was not.   Here is a general undertaking to return the property in good order, and it has perished without any fault on the part of the defendant by a natural force that could not be resisted, and we are of opinion that an undertaking to assume such a risk ought to be special and express, and so clear as not to admit of any other construction.   Such is not the case here.

The hirer was even excused from paying for the use of the barge, if it should be frozen up; and if the plaintiff had been asked whether he expected pay for it, in case it should perish by the same overpowering force, can there be any doubt as to the answer he would have given?

Judge Ryland concurring, the judgment is reversed, and the cause remanded.

Scott, Judge.   When the law creates a duty and the party is disabled to perform it without any default in him, and he has no remedy over, the law will excuse him.   But when the party, by his own contract, creates a change or duty upon himself, he is bound to make it good, if he can, notwithstanding any accident by inevitable necessity; because he might have provided

against it by his contract. This is a principle as well estab-
lished in our law as any to be found within its folds. It has
prevailed too long and exercised its influence in too many ways,
now to be overthrown without much inconvenience and the caus-
ing of many future difficulties. This principle is a manifesta-
tion of the spirit of the race for whom our noble system of law
was moulded; a spirit of bold, self-reliance, which scorns to
resort to government for protection against events, whose occur-
rence might be obviated by the exercise of ordinary vigilance.
It is this spirit which distinguishes the common from the civil
law : a spirit, too, which distinguishes the people that are gov-
erned by the two systems of law. Too great a reliance on gov-
ernment for protection in matters against which the exercise
of the faculties with which man is endowed by nature may guard
him, begets a spirit of dependence which is inconsistent with
that freedom of thought and action which should animate a
self-governing people.

It would be a display of useless research to attempt a refer-
ence to the many cases in which the principle in question has
been asserted and maintained. The books are full of them,
and I conceive that there is no authority in the courts to depart
from the law as it has been invariably understood. There is
nothing whatever to distinguish this case from the many others
which have occurred in the course of the administration of our
laws ; and if the principle is not adhered to in this instance, it
must be regarded as overturned—an act to the performance of
which the legislature is alone competent. There may be cases
in which the application of the principle will effect complete
justice between the parties. Who shall draw the line of dis-
tinction ? Is not that the province of the law-maker ? It is
always safer, in a government of laws, to have fixed rules for
the interpretation of contracts, than that every thing should be
left to the discretion or sense of justice of the judge. Too
much is already left to the discretion of the judge in our law,
and the occasions for the exercise of such discretion should not
be multiplied.