**DICKEY COMPANY, INC.,
Plaintiff-Respondent,**

v.

**F. A. KANAN et al.,
Defendants-Appellants.**

**No. 9911.**

Missouri Court of Appeals,
Springfield District.

May 14, 1976.

---

John R. Lewis, Kirby, Lewis, Cohick & Franks, Springfield, Jon Dermott, Blanchard, Van Fleet, Robertson & Dermott, Joplin, for plaintiff-respondent.

Richard M. Webster, Myers, Webster & Perry, Webb City, for defendants-appellants.

Before BILLINGS, C. J., and TITUS and FLANIGAN, JJ.

TITUS, Judge.

Defendants admitted owing plaintiff Dickey Company, Inc., a $16,200 commission for procuring a restaurant-lease of adjacent properties owned separately by defendants F. A. and Elma Kanan (husband and wife) and defendant Ancell Enterprises, Inc. A dispute as to how the commission was to be paid spawned this lawsuit. Plaintiff averred defendants agreed to pay half the commission ($8,100) when the lease was executed and the other half over the following five years with 6% interest. Defendants asseverated they agreed to pay $540 upon execution of the lease and $45 a month thereafter for 348 months with no interest.[1] A jury returned a verdict compatible with plaintiff's claim.

In early June 1969, John Dickey (for plaintiff) encountered Mrs. Kanan at her home situate on the Kanans' property. When advised that Dickey "wanted to talk about leasing the property for a restaurant," Mrs. Kanan told him "Mr. Ancell handled their leases." This was Dickey's only conversation with Mrs. Kanan and he admittedly "never discussed a real estate commission with Mrs. Kanan." She asserted she had never discussed the manner of commission payment with anyone.

■ Conferences anent the proposed lease followed between Dickey and Ancell. According to Dickey's unobjected-to testimony, "Mr. Ancell explained to me that he represented both . . . Ancell Enterprises, Inc. and Mr. and Mrs. Kanan."[2] In late July 1969, Dickey went to Ancell's office with the written lease and told Ancell that "before we sign the leases [sic], let's make an agreement on the commission." When Ancell assented, Dickey produced printed commission forms. By Dickey's account, Ancell then proceeded to dictate to Dickey the terms for paying the $16,200 commission. The payments to be made, as dictated by Ancell and recorded on the form by Dickey, were the same as now contended by defendants, supra. After completion, and after Ancell added to the form "no interest—The commission is to be enclosed in the lease," it was signed "Ancell Enterprises, Inc. Larry E. Ancell Vic. Pres." Ancell did not undertake to sign the agreement on behalf of Mr. and Mrs. Kanan. Neither Dickey nor the Kanans ever signed the form. Although Ancell denied having dictated the terms and testified the commission payments as recorded on the form were "acceptable [to Dickey because] we agreed on it before he wrote it out," Dickey stated he had informed Ancell that "I could not accept it . . . we could not live with this agreement." Dickey further recounted that after telling this to Ancell, he (Dickey) "suggested" the commission be paid "half at the time and half later and [Ancell] said, 'We won't do that,' and that's when I took the leases [sic] and started to go." Dickey testified that "We did not have an agreement" when he left Ancell's office, and that he "did not again talk to Mr. Ancell about a commission."

As Dickey was departing Ancell's office, "Mr. Kanan came in the door and [Dickey] was introduced to Mr. Kanan for the first time." Dickey told Mr. Kanan he was leaving with the unsigned lease and Kanan "suggested that we go have a cup of coffee." Ancell did not accompany them. Dickey stated that while he talked to Ka-

---

1. As initially contemplated, the lease would run for 30 years with ground rent payable at $750 per month ($9,000 per year) for a total ground rent of $270,000 over the entire lease period. The commission and commission payments were calculated at 6% of the ground lease figures.

2. Had this statement been objected to, it would seem that neither the fact nor scope of the claimed agency could have been established by a recitation of the out-of-court declaration of the alleged agent. *Rosser v. Standard Milling Company*, 312 S.W.2d 106, 110[2] (Mo.1958); *Fielder v. Production Credit Association*, 429 S.W.2d 307, 310 (Mo.App.1968).

nan over coffee, he did not show Kanan the commission agreement form although they did "discuss what had been proposed in that agreement." By Dickey's version "I told Mr. Kanan that the only way we could accept it was half at that time and half paid in five years, and he said 'What difference does it make whether I borrow $150,000 or $158,000 at the time I build the building, live and let live this is my motto.' This is his exact words." Based on this, Dickey said he "believed" Mr. Kanan had "agreed to pay . . . one half of it down and the balance of the commission over the five-year period." Dickey left the lease copies with Mr. Kanan and from that "time on I dealt strictly with Mr. Kanan, I never again dealt with Mr. Ancell. . . . Mr. Kanan instructed me that from now on out I was dealing strictly with him and no longer with Mr. Ancell." Dickey did not prepare another commission agreement form to be signed by the defendants because "I thought I had a verbal agreement with Mr. Kanan." Plaintiff's agent, while saying that interest was discussed, acknowledged that he "didn't discuss the rate" and that he did not "ever reach an agreement upon which a note could be drawn" to evidence the defendants' obligations to pay any part of the commission. The lease was signed by all the defendants and returned to Dickey. It did not mention the commission.

It was Mr. Kanan's testimony that when he was having coffee with Dickey on the aforementioned occasion, he was shown and discussed the commission agreement form which previously had been signed by Ancell Enterprises, Inc. Kanan recounted: "The agreement that I stated to Mr. Dickey will be the one it's been read in here, it's already made with Mr. Ancell and we'll go ahead with it and live and be live, that's my statement was to Mr. Dickey." [3]

Plaintiff's verdict-directing instruction (Instruction No. 2—MAI 29.02 modified)

read: "Your verdict must be for plaintiff if you believe: First, plaintiff was a licensed real estate broker,[4] and Second, plaintiff and defendants agreed that plaintiff should receive a sum of $16,200.00 payable $8,100.00 in cash on date of closing and $8,100.00 over a period of five years as commission, if defendants' property was leased as a result of plaintiff's efforts, and Third, defendants leased the property as a direct result of plaintiff's efforts, unless you believe plaintiff is [5] entitled to recover by reason of Instruction No. 3." Defendants' Instruction No. 3 submitted their theory as to how the commission was to be paid. In substance and in part, defendants' points relied on are that the trial court erred in not granting them a new trial for error in giving Instruction No. 2, supra, because there was no evidence to support the hypothesis that "defendants agreed" to payment of the commission in the manner set forth in the charge. It is our opinion that defendants' contention has merit.

■ Assuming, arguendo, Mrs. Kanan's statement to Dickey that "Mr. Ancell handled their leases" and Dickey's unobjected-to recitation of Ancell's out-of-court assertion "that he represented both . . . Ancell Enterprises, Inc. and Mr. and Mrs. Kanan," were sufficient proof that Ancell was agent of the three defendants both for leasing their properties and contracting concerning commissions, we are, nonetheless, confronted with Dickey's testimony that he never had a commission agreement with Ancell and with Ancell's testimony that the commission agreement differed from what plaintiff contended. Consequently, the purported agency of Ancell as a source of tying defendants, or any of them, to the agreement alleged by plaintiff is wholly destroyed.

■ Ordinarily one's belief, feeling, understanding or thought about a matter

---

3. Mr. Kanan came to this country from Palestine some 18 years ago which probably explains his unorthodox use of the English language.

4. That plaintiff was a licensed real estate broker was not an issue in the case. *Ergo*, paragraph First should have been omitted. Notes on Use, MAI 29.02.

5. The word "not" is missing.

does not constitute substantial evidence justifying or permitting a finding to that effect. *Dill v. Poindexter Tile Company*, 451 S.W.2d 365, 372[9] (Mo.App.1970); *Bailey v. Kershner*, 444 S.W.2d 10, 15 (Mo.App.1969); *Gonseth v. K & K Oil Company*, 439 S.W.2d 18, 25[9] (Mo.App.1969). However, if we again reluctantly assume, but purely arguendo, that what Dickey "believed" or "thought" about Mr. Kanan's rhetorical question[6] constituted some basis for permitting or justifying a finding that Kanan agreed to paying the commission as proposed by Dickey, there is not a jot of evidence that Mr. Kanan, either actually or apparently, was then acting as agent for or to bind Ancell Enterprises, Inc., or his wife.

The law indulges no presumption that agency exists [*Mark Century Corp. v. Tiger Broadcasting Co.*, 509 S.W.2d 737, 739[5] (Mo.App.1974); *Erickson v. Civic Plaza Nat. Bank of Kansas City*, 422 S.W.2d 373, 380[15] (Mo.App.1967)], and the burden of establishing agency is on the party by whom it is alleged to exist. *Nelle Plumbing Company v. Stefanic*, 453 S.W.2d 636, 641[8], 48 A.L.R.3d 145, 151[6] (Mo.App. 1970); *Roy v. Tinsley*, 355 S.W.2d 621, 625[2] (Mo.App.1962). Merely because of the marital relationship, neither the husband nor the wife is empowered to act as agent for the other [*Murphy v. Olds*, 508 S.W.2d 249, 253[8] (Mo.App.1974); *Vaughn v. Great American Insurance Company*, 390 S.W.2d 622, 627[10] (Mo.App.1965)], and absent proof of facts or circumstances showing agency, the power of the husband to act as agent for his wife will not be inferred. *Gottlieb v. LaBrunerie*, 514 S.W.2d 27, 32 (Mo.App.1974).

While the evidence may have shown Ancell to have been the agent for defendants, it did not suggest that Mr. Kanan was agent for anyone. There being no evidence of Kanan's agency for either of the other two defendants and no showing that either of them agreed to plaintiff's proposed contract as to how the commission was to be paid, it is obvious *no evidence existed from which the jury could find the issues* (as submitted by Instruction No. 2) against defendants Ancell Enterprises, Inc., or Elma Kanan. "There is nothing more firmly entrenched in the law than the requirement that issues submitted in instructions to the jury be supported by evidence from which the jury could reasonably find such issue. 'An instruction which is not supported by the evidence is erroneous in that it is misleading and confusing.'" *Brassfield v. Sears*, 421 S.W.2d 321, 323 (Mo.1967).

From what has been said, it follows that the judgment nisi is reversed and the cause is remanded for a new trial.[7]

All concur.

---

6. "What difference does it make whether I borrow $150,000 or $158,000 at the time I build the building, live and let live this is my motto."

7. We have not overlooked the false argument of plaintiff that when Mrs. Kanan and Ancell Enterprises, Inc., signed the lease, they ratified and approved Mr. Kanan's alleged agreement with Dickey as to the commission payments.

Such an argument may have worked against Mrs. Kanan and the defendant corporation in an action to enforce the lease or any other action regarding the lease itself, but it assuredly has no merit in an independent action, such as this, to enforce an averred contract for the method of payment of a commission to a real estate broker.