HESHION MOTORS, INC., Respondent,

v.

WESTERN INTERNATIONAL HOTELS, Appellant-Respondent,

v.

AMERICAN MOTORISTS INSURANCE COMPANY, Appellant.

No. KCD 30286.

Missouri Court of Appeals, Western District.

May 5, 1980.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 9, 1980.

Laurence R. Tucker, David E. Larson, Morris, Larson, King, Stamper & Bold, Kansas City, for American Motorists Ins. Co., appellant.

Robert J. Harrop, Gage & Tucker, Kansas City, for Western Intern. Hotels, appellant-respondent.

Kuraner, Schwegler, Kinton, Lowe & Fishman, James W. Humphrey, Jr., Kansas City, for Heshion Motors, Inc., respondent.

Before SOMERVILLE, P. J., and PRITCHARD and MANFORD, JJ.

PER CURIAM.

Plaintiff Heshion Motors, Inc. (hereinafter Heshion), bailor, brought an action for damages against defendant Western International Hotels (hereinafter Western), bailee, for returning a new 1974 Rolls Royce automobile, the subject of the bailment, in a damaged condition. Heshion's pleaded and submitted[1] theory of recovery was premised upon Western's breach of the contract of bailment, i. e., Western's failure to return the subject of the bailment in an undamaged condition. Under authority of representative cases such as *Broadview Leasing Co. v. Cape Central Airways, Inc.*, 539 S.W.2d 553 (Mo.App.1976), and *Nuell v. Forty-North Corporation*, 358 S.W.2d 70 (Mo.App.1962), Heshion opted to pursue its claim against Western under a theory of breach of contract as opposed to a theory of general negligence or a theory of specific negligence which are also recognized in *Nuell* and *Broadview Leasing Co.* as alternative theories of recovery open to a bailor in a bailment action. Parenthetically, *Nuell* and *Broadview Leasing Co.* vividly articulate some of the confusion and uncertainty coursing through the case law of this state by reason of the triune option vested in bailors as to the theory of recovery they elect to pursue in bailment actions.

Western, as defendant and third-party plaintiff, by leave of court, filed a third-party petition against American Motorists Insurance Corporation (hereinafter American), as third-party defendant, seeking judgment against American for any amount that Heshion might recover against Western, plus reasonable attorney fees and costs incurred by Western in defending the principal action, by virtue of a "manuscript" policy of liability insurance issued by American to Western whereunder American had denied coverage and refused to defend the principal action brought by Heshion.

The principal action was tried to a jury and resulted in a verdict and judgment in favor of Heshion and against Western in the sum and amount of $6,517.50. As to disposition of the third-party claim, the trial court entered summary judgment in favor of Western and against American for the amount adjudged in favor of Heshion against Western in the principal action, plus $5,789.34 as a reasonable attorney's fee and $431.64 as costs incurred by Western in defense of the principal action which Western and American stipulated to as being fair and reasonable · in the event it was determined there was coverage under the policy of liability insurance.

Understandably, Heshion made no effort to assert any claim against third-party defendant American and a careful perusal of the record discloses no hint or suggestion that the jury which tried the principal action was ever aware of the pendency or disposition of Western's third-party claim against American.

Western has appealed from the judgment rendered against it in favor of Heshion and American has appealed from the summary judgment rendered against it in favor of Western. Moreover, after both appeals

---

1. Heshion's verdict directing instruction, unchallenged on appeal, comported with the bailor's verdict-director set forth in *Broadview Leasing Co. v. Cape Central Airways, Inc.*, 539 S.W.2d 553, 558, footnote 5 (Mo.App.1976), and reads as follows:

"INSTRUCTION NO. 3

Your verdict must be for plaintiff Heshion Motors, Inc. and against defendant Western International Hotels if you believe:

FIRST, plaintiff was the owner of the 1974 Rolls Royce automobile referred to in the evidence; and

SECOND, Said 1974 Rolls Royce automobile was delivered to the defendant for display purposes; and

THIRD, While the 1974 Rolls Royce automobile was in the possession of the defendant, it was damaged; and

FOURTH, the 1974 Rolls Royce automobile was returned to the plaintiff in a damaged condition,

Unless you believe the plaintiff is not entitled to recovery by reason of Instruction No. 4."

reached this court, Western filed a motion imploring this court to remand the case to the trial court with instructions to enter an additional judgment in favor of Western against American for reasonable attorney fees and costs incurred by Western in connection with its appeal in the principal action and in connection with American's appeal from the summary judgment in the event the summary judgment entered by the trial court was affirmed on appeal. Western's motion for additional attorney fees and costs was ordered "taken with the case".

Western's appeal from the judgment rendered against it in favor of Heshion will be addressed first; American's appeal from the summary judgment rendered against it in favor of Western will be addressed next; and Western's motion for attorney fees and costs in both appeals will be addressed last.

Western contends that the judgment rendered against it in favor of Heshion in the sum and amount of $6,517.50 should be reversed and the cause remanded for a new trial for two reasons: (1) error on the part of the trial court in refusing to give either Western's requested instruction submitting "assumption of risk" or Western's requested instruction submitting "contributory negligence" in that Western affirmatively pleaded both in the alternative and there was evidence to support a finding by the jury, under one or both affirmatively pleaded defenses, that Heshion's conduct directly caused or contributed to cause the damage sustained by the Rolls Royce while in Western's possession as bailee; and (2) error on the part of the trial court in permitting counsel for Heshion during closing argument, over Western's objection and in face of a motion for a mistrial, to misstate the law by arguing that Western had more than a duty to show generally that it exercised "ordinary care" while the Rolls Royce was in its possession in that it was also required to show the cause or source of the damage to the Rolls Royce while in its possession.

Attention now shifts to the facts in order to put the issues in the principal action in proper perspective. In November 1974, Western, operator of the Crown Center Hotel in Kansas City, Missouri, undertook a Christmas promotion project the theme of which was "Something for those with a style of their own". To advance this theme Western intended to publicly display a Rolls Royce automobile and other luxury items at the Crown Center Hotel. An employee of Western responsible for the promotion contacted Heshion, a corporation, to "borrow" a new Rolls Royce to place on public display. Western's employee was referred to Bernard Heshion, president of Heshion. Initially, Bernard Heshion was reluctant to make a new Rolls Royce available to Western for its Christmas promotion because of "bad experience" on past occasions due to damage incurred to Rolls Royce while on public display. Consequently, Bernard Heshion stressed the importance of "fencing off" Rolls Royce automobiles when placed on public display.

Subsequent contacts between Western's employee and Bernard Heshion culminated in an oral agreement between Heshion and Western for the loan of a new Rolls Royce to be publicly displayed at Crown Center Hotel. Heshion insisted that the Rolls Royce be "fenced" while on public display and Western's employee agreed to do so.

A few days before the Rolls Royce was delivered to Western, Bernard Heshion contacted Western's employee and advised that Jim Heshion, his brother, would deliver the Rolls Royce which was to be placed on public display. Bernard Heshion then advised his brother, Jim Heshion, that he had agreed to loan the Rolls Royce to Western for display purposes and gave him a note containing the words "must be fenced". Bernard Heshion asked his brother Jim Heshion to deliver the Rolls Royce to Western, instructed him to be sure the tires were properly inflated, to place a sign with Heshion's name on it in the window of the Rolls Royce, and to deliver a "special wiping cloth" to Western. There was no evidence whatever that Bernard Heshion, president of Heshion, ever authorized his brother, Jim Heshion, to vary or modify Heshion's oral

agreement with Western that the latter keep the Rolls Royce "fenced" while it had it on public display. Jim Heshion was a salesman for Heshion. He was not a stockholder, director or officer of the corporation; nor was he salesmanager for the sale of Rolls Royce automobiles. Western's employee was aware that Jim Heshion was an employee of Heshion and the brother of Bernard Heshion, nothing more.

Before the Rolls Royce was delivered, Western located a wrought iron fence which was described as "not being in very good shape and it was dirty". When Jim Heshion delivered the Rolls Royce to the Crown Center Hotel he was shown the condition of the wrought iron fence at which time Western's employee suggested that metal stanchions connected by a rope be used in lieu of a "fence" as previously agreed upon. Jim Heshion voiced no objection to Western's use of metal stanchions connected by a rope in lieu of a fence. Western does not contend that the metal stanchions connected by a rope constituted a "fence" in the sense originally agreed upon by Western and Heshion.

Western placed the Rolls Royce on public display in the lobby of the Crown Center Hotel and placed the metal stanchions connected by rope, rather than a "fence", around the vehicle as a means of protecting it. When the Rolls Royce was delivered to Western it was undamaged and in good condition. Neither Jim Heshion nor Western's employee ever advised Bernard Heshion, or any other employee or officer of Heshion, that the Rolls Royce was being displayed by Western without a protective "fence" as orally agreed upon. Bernard Heshion, president of Heshion, first learned that the Rolls Royce was being so displayed when he went to pick it up after Western's Christmas promotion was concluded. The Rolls Royce was returned to Heshion in a damaged condition. The nature and extent of the damage sustained by the Rolls Royce while on public display is not an issue on appeal. When Bernard Heshion arrived at Crown Center Hotel to pick up the Rolls Royce he noticed that children were playing around it and knocking the metal stanchions down.

The "assumption of risk" and "contributory negligence" instructions alternatively tendered by Western and refused by the trial court were both predicated upon the theory that Jim Heshion, brother of Bernard Heshion, had "apparent" authority to vary or modify the oral agreement struck between Heshion and Western regarding Western's duty to keep the Rolls Royce "fenced" as a protective measure while it was on public display. Heshion counters Western's first point, i. e., that the trial court erred in refusing to give one or the other of the referred to instructions, by arguing that (1) neither "assumption of risk" or "contributory negligence" were legally viable defenses to its claim or cause of action as it was bottomed on breach of contract as opposed to general or specific negligence and (2) there was no substantial evidence to support submission of the issue of "apparent authority" to the jury.

In order to dispose of Western's first point it is unnecessary to decide whether "assumption of risk" or "contributory negligence" are legally recognized defenses in a bailment action premised on a breach of contract. Therefore, any discussion of the first aspect of the point at hand would fall in the realm of academia and dictum and further protract an already unavoidably protracted opinion. As to the second aspect of Heshion's first point, it is important to recognize that both instructions were cast in terms of "apparent" authority as distinguished from implied authority to submit the integral component that Jim Heshion had authority to vary or change the oral agreement reached between Western and Heshion. The gamut of apparent authority finds clarity of expression in *Continental-St. Louis Corp. v. Ray Scharf Vending Co.*, 400 S.W.2d 467, 470 (Mo.App. 1966): "It is to be noted that both the Restatement and American Jurisprudence refer to the principal's conduct or manifestations and not to those of the agent. It is well settled that apparent or ostensible authority is not to be determined from the

acts or statements of the agent *but from the acts, statements or other manifestations of the principal.* Apparent authority cannot be created by the agent's own conduct and statements and neither can it be enlarged in that manner. 3 Am.Jur.2d, Agency, § 75, p. 479. In that same section at page 477 it is stated that there are three prerequisites to the establishment of apparent or ostensible authority. It must be established (3 Am.Jur.2d, Agency, § 75, pp. 477–478) ' * * * (1) *that the principal has manifested his consent to the exercise of such authority or has knowingly permitted the agent to assume the exercise of such authority*; (2) that the third person knew of the facts and, acting in good faith, had reason to believe, and did actually believe, that the agent possessed such authority; and (3) that the third person, relying on such appearance of authority, has changed his position and will be injured or suffer loss if the act done or transaction executed by the agent does not bind the principal. * * *' " (Emphasis added.) The adoption of Missouri Approved Instructions has not changed the obtaining principle in this state that issues submitted in instructions must be supported by substantial evidence. *Gathright v. Pendegraft*, 433 S.W.2d 299, 313 (Mo.1968); and *Brassfield v. Sears*, 421 S.W.2d 321, 323 (Mo.1967). Concomitantly, it is error to give an instruction where substantial evidence is lacking to support the issues submitted. *Brassfield v. Sears, supra; Wired Music, Inc. v. O'Brien*, 556 S.W.2d 459 (Mo.App.1977); and *Dickey Co., Inc. v. Kanan*, 537 S.W.2d 430 (Mo.App. 1976). In the instant case there was no substantial evidence to support the first prerequisite set forth in *Continental-St. Louis Corp. v. Ray Scharf Vending Co., supra*, namely, that Heshion manifested its consent to the exercise of any purported authority on Jim Heshion's part to vary or modify the oral agreement reached between Heshion and Western, if in fact Jim Heshion did so, or that Heshion knowingly permitted Jim Heshion to assume the exercise of such purported authority. At best, the evidence merely disclosed that Jim Heshion, albeit an employee of Heshion and a broth-

er of its president, was to deliver the Rolls Royce and "a special wiping cloth" to Western and place a sign provided by Heshion in the Rolls Royce. The minimal nature of such evidence falls fatally short of substantial evidence that Heshion manifested its consent to an exercise of authority by Jim Heshion to vary or change the oral agreement reached between Heshion and Western that the car was to be "fenced" while on public display or that Heshion knowingly permitted Jim Heshion to assume the exercise of such purported authority. Western obliquely attempts to bring the issue of apparent authority within the purview of the theory espoused by this and other courts in cases such as *Erickson v. Civic Plaza Nat. Bank of Kansas City*, 422 S.W.2d 373, 380 (Mo.App.1967), to the effect that a principal is bound by the acts of his agent when he has placed the agent in such a position " 'that a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in presuming that such agent has authority to perform on behalf of his principal a particular act . . . .' " There is not a scintilla of evidence that Western's employee with whom Heshion exclusively dealt was "conversant with business usages and the nature of the particular business" appertaining to the delivery of automobiles in general, or, more particularly, with respect to the delivery of new automobiles to bailees for the purpose of placing them on public display. Nor is there so much as a scintilla of evidence that mere employees of automobile dealers, such as Jim Heshion, authorized to deliver automobiles under the circumstances at hand and perform such duties of the type disclosed by the evidence in the instant case, according to "business usages and the nature of the particular business", are ostensibly clothed with authority to vary or modify the terms of an oral agreement previously struck between their principal and a bailee as to safety measures to be taken by the latter to protect such automobiles while on public display. Having concluded that there was no substantial evidence to support the com-

ponent element of apparent authority common to both of the instructions tendered by Western, it cannot be said that the trial court erred in refusing to give such instruction.

■ Western's second point faults the trial court for permitting Heshion's counsel, over objection, "to misstate the law during his closing argument". More precisely, the point zeros in on Heshion's counsel's argument, appropriately paraphrased, that Western failed to offer any evidence to account for or to explain the cause of the damages sustained by the Rolls Royce while in its possession notwithstanding its claim that it exercised ordinary care. As succinctly stated in *Nuell v. Forty-North Corp., supra,* 358 S.W.2d 70, 76 (Mo.App.1962), citing *E. O. Stanard Milling Co. v. White Line Cent. Transit Co.,* 122 Mo. 258, 26 S.W. 704 (1894), *Goodfellow's Executors v. Meegan,* 32 Mo. 280 (1862), and *Freeman v. Foreman,* 141 Mo.App. 359, 125 S.W. 524 (1910), "[t]he correct rule seems to be that if the bailor merely pleads the bailee's breach of the contract by failure to redeliver, . . . *the burden of proof is on the bailee to excuse or explain his failure to return the property.*" (Emphasis added.)

■ Instruction No. 4, requested by Western and given by the trial court, is of magnum significance. Briefly, Instruction No. 4, submitting the affirmative defense of ordinary care[2] on Western's part (*Broadview Leasing Co. v. Cape Central Airways, Inc.,* 539 S.W.2d at 561) was patterned after the instruction which was given and which withstood a multifaceted attack on appeal in *Broadview Leasing Co. v. Cape Central Airways, Inc.,* 539 S.W.2d at 558, footnote 6. Instruction No. 4 in the instant case reads as follows:

### "INSTRUCTION NO. 4

Your verdict must be for defendant Western International Hotels if you believe:

First, that defendant Western International Hotels used ordinary care for the protection of plaintiff's Rolls Royce while it was in the possession of defendant Western International Hotels, or

Second, that plaintiff's damages were not a direct result of the failure of defendant Western International Hotels to use ordinary care."

By way of analysis, the thrust of the first disjunctive submission is to "excuse" Western's return of the Rolls Royce in a damaged condition, and, concomitantly, exonerate Western if the jury found that it exercised ordinary care while the Rolls Royce was in its possession; the thrust of the second disjunctive submission is to "explain" Western's return of the Rolls Royce in a damaged condition, and, concomitantly, exonerate Western if the jury found that a cause which was apart from and not a direct result of Western's failure to exercise ordinary care caused the damage to the Rolls Royce while it was in its possession. Both analyses are compatible with the general statements of law set forth in *Nuell v. Forty-North Corporation, supra.* Western in its brief argues that although a bailee *may* show the cause of loss or damage to property the subject of a bailment while in its possession, the "only legal requirement, however, is that the bailee show the exercise of due care." This argument is at war with the second disjunctive submission in Instruction No. 4 which was given by the trial court at Western's request. In view of the posture of the limited issues on appeal, it is not incumbent upon this court to determine whether there was substantial evidence to support the second disjunctive submission contained in Instruction No. 4. A careful perusal of the closing argument of Heshion's counsel in its entirety convinces this court that its true tenor was that no evidence had been adduced which would justify or support a finding by the jury "that plaintiff's damages were not a direct result of the failure of defendant Western

2. Heshion and Western both proceeded on the theory that the bailment was one for the mutual benefit of both the bailor and bailee and the standard of care imposed upon Western was that of ordinary care.

International Hotel to use ordinary care", as disjunctively submitted by Instruction No. 4. It is impossible for this court to envision how a jury could find "that plaintiff's damages were not a direct result of the failure of defendant Western International Hotels to use ordinary care" absent evidence showing what caused said damages to the Rolls Royce. Otherwise, the jury would be cast in the tenuous waters of speculation, conjecture and surmise in order to determine whether the damage to the Rolls Royce "was not a direct result of the failure of defendant Western International Hotel to use ordinary care". Indubitably, misstatements of law are impermissible during closing argument and a positive and absolute duty, as opposed to a discretionary duty, rests upon a trial judge to restrain and purge such arguments. *White v. Gallion*, 532 S.W.2d 769, 771 (Mo.App.1975); and *Carrel v. Wilkerson*, 507 S.W.2d 82, 86 (Mo.App.1974). On the other hand it is equally recognized that the permissible field of argument is broad, and so long as counsel does not go beyond the evidence and the issues drawn by the instructions, or urge prejudicial matters or a claim or defense which the evidence and issues drawn by the instructions do not justify, he is permitted wide latitude in his comments. *Hoehn v. Hampton*, 483 S.W.2d 403, 408 (Mo.App. 1972). The complained of argument was within the purview of the second disjunctive submission contained in Western's Instruction No. 4 because, as properly perceived, counsel for Heshion was arguing that since no evidence was adduced to show that the damage to the Rolls Royce was due to a cause which was apart from and not a direct result of Western's failure to exercise ordinary care, ipso facto, no evidence was adduced to support a finding by the jury that the damage to the Rolls Royce was "not a direct result of the failure of defendant Western International Hotel to use ordinary care." Perforce, Western's objection to the closing argument of Heshion's counsel was not well taken and the trial court committed no error in so holding.

A few prefatory remarks are in order before launching into the merits of the issues raised by American on its appeal from the summary judgment entered in favor of Western and against American on Western's third-party petition. After the principal action was filed by Heshion, Western made a demand upon American to defend the same on its behalf under the liability policy issued by American to Western. American refused to do so, apparently upon the ground that the damage to the Rolls Royce was excluded from coverage under the terms of the policy. Upon American's refusal to defend the principal action on Western's behalf, Western, by leave of court, as third-party plaintiff filed a third-party petition against American as third-party defendant. Briefly, and insofar as here pertinent, Western alleged that American had refused to defend the principal action on its behalf, that Heshion's claim was within the terms of the coverage afforded by the policy of liability insurance issued by American to Western, that Western had performed all conditions under the liability policy, and that American was liable to Western for the amount of any judgment that Heshion might obtain against Western and for reasonable attorney fees and costs incurred by Western in defending the principal action brought by Heshion. Western prayed for relief against American accordingly. Parenthetically, the amount of damages prayed for and recovered by Heshion fall within the applicable limit of coverage set forth in the liability policy issued by American to Western.

American filed a motion to dismiss Western's third-party petition which was overruled by the trial court. The crux of American's motion to dismiss was that the third-party petition was "premature" and violated policy condition 6 which reads in part as follows: "No action shall lie against the company . . . until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company . . . nor shall the company be impleaded by the insured or his legal representative . . .".

American also moved to have the third-party action severed for separate trial which was denied by the trial court. In its answer to Western's third-party petition, American, among other things, alleged that it "explicitly denies that the policy covers such allegations as are made by the plaintiff [Heshion] in plaintiff's [Heshion's] petition." First Western and then American filed motions for summary judgment with the end result, as heretofore noted, that Western succeeded and American failed.

American raises three points on appeal. As perceived by this court they may be fairly summarized as follows: (1) error on the part of the trial court in overruling American's motion to dismiss Western's third-party petition because it was prematurely filed as it was prohibited by the "no-action" clause contained in said liability policy and the trial court's refusal to give the "no-action" clause efficacy violated public policy; (2) error on the part of the trial court in denying American's motion for severance because doing so tainted the principal action with the prejudicial specter of insurance; and (3) error on the part of the trial court in granting summary judgment in favor of Western and against American because the loss claimed by Heshion was excluded from coverage by reason of Exclusion (1)4 of the liability insurance policy. Exclusion (1)4 and other relevant policy provisions will subsequently be set forth.

The course of American's argument with respect to point one, unembellished and simply put, runs as follows: Western's third-party petition was prematurely filed in that timewise it was expressly prohibited by the "no-action" clause contained in the liability policy which was unambiguous, binding on the insured, and compatible with public policy. American, in advancing this argument, conveniently ignores the fact that it denied coverage and refused to defend the principal action on Western's behalf. Rule 52.11 provides, in part, that "[a]t any time after commencement of the action a defending party, as a third-party plaintiff, may cause a summons and petition to be served upon a person not a party to the action *who is or*

*may be liable to him for all or part of the plaintiff's claim against him.*" (Emphasis added.) This rule is patterned after Rule 14, Federal Rules of Civil Procedure.

In *Jordan, et al. v. Stephens, et al.*, 7 F.R.D. 140 (W.D.Mo.1945), where the principal action was based on injuries allegedly caused by the defendants, defendants were permitted to implead their liability insurer, notwithstanding a "no-action" clause similar to the one in the instant policy (save for the additional prohibition in the instant "no-action" clause against impleading the insurer). The rationale for permitting defendant-insureds in *Jordan* to maintain a third-party action against their insurer was forcefully expressed as follows, 7 F.R.D. at 142: "The 'no-action' clause is directly opposed to Rule 14. It poses a question as to whether the court should permit litigants to circumvent rules of court by contractual arrangements. Rule 14 was promulgated not only for the purpose of serving litigants but as a wise exposition of public policy. The object of the rule was to facilitate litigation, to save costs, to bring all of the litigants into one proceeding, and to dispose of an entire matter without the expense and the labor of many suits and many trials. The no-action provision of the policy is neither helpful to the third-party defendant, to the courts, nor generally is it in the interest of the public welfare. Its object is to put weights on the already too slow feet of justice. Moreover, such provision, if permitted to become effective, should not operate in this case for the reason that the third-party defendant is alleged to have breached its contract. According to the third-party complaint, it has declined to perform the obligation of its undertaking in any way. It has refused to defend the defendants or third-party plaintiffs and has declined to meet the expenses contemplated by its contract. Under such circumstances it should not be permitted to interpose contractual provisions of a contract it has repudiated." A vast array of other jurisdictions with statutes or rules of procedure similar to Rule 52.11 and Rule 14, Federal Rules of Civil Procedure, have followed suit and per-

mitted defendant-insureds to implead their liability insurers in actions brought by injured parties notwithstanding comparable "no-action" clauses (some having "no-action" clauses containing, as in the instant case, an additional prohibition against impleading the insurer). *Colton v. Swain*, 358 F.Supp. 859 (N.D.Ill.1973); *Pioneer Mut. Compensation Co. v. Cosby*, 125 Colo. 468, 244 P.2d 1089 (1952); *Schurgast v. Schumann*, 156 Conn. 471, 242 A.2d 695 (1968); *Wright Const. Co. v. St. Lawrence Fluorspar, Inc.*, 254 A.2d 252 (Del.Super.1969); *United States Fidelity & G. Co. v. Continental Ins. Co.*, 216 Kan. 5, 531 P.2d 9 (1975); *Jenkins v. General Accident Fire & Life Assur. Corp.*, 349 Mass. 699, 212 N.E.2d 464 (1965); and *Judy Negligee, Inc. v. Portnoy*, 194 Misc. 508, 89 N.Y.S.2d 656 (1949). Permitting insureds to implead their insurers under like circumstances has received widely heralded approval in recognized legal treatises. For example, see: 1A Barron and Holtzoff, Federal Practice and Procedure, Sec. 426.2, pp. 688–92 (1960); 6 Wright and Miller, Federal Practice and Procedure, Sec. 1449, pp. 267–73 (1971); and 3 Moore, Moore's Federal Practice, Para. 14.12, pp. 14–325–27 (1979).

▮▮▮ The above cases and treatises are persuasive and constitute strong support for holding that the trial court did not err in permitting Western to file and maintain its third-party petition against American. The following observations serve to better explain and buttress this holding. The amount of the judgment obtained by Western against American under the third-party petition concerning Western's obligation to Heshion was synchronized with such amount as was "finally determined by judgment against" Western in the principal action "after actual trial" (Condition 6 of the liability policy, the no-action clause). Pragmatically, legal determination of Western's right to recover against American the amount of any judgment obtained by Heshion against Western, plus reasonable attor-

ney fees and costs incurred in defending the principal action, was merely accelerated. American's denial of coverage and refusal to defend the principal action was the catalyst for this acceleration. Absent American's denial of coverage and refusal to defend, Western had no basis or occasion to utilize Rule 52.11 and file its third-party petition against American. Since American allegedly breached its contract by denying coverage (an issue to be subsequently resolved) and refusing to defend it would be imprudent to hold that American could interpose a contractual provision of the insurance policy under which it had repudiated coverage[3] as a bar to Western's right to presently maintain its third-party action. The purpose of Rule 52.11 is manifold—to avoid multiplicity of actions, to minimize time and expense of litigation, to achieve maximum utilization of court facilities and judicial capacity, and to render ultimate justice. These purposes are consonant with sound public policy, and to bar Western's right to maintain its third-party petition against American under existent circumstances would retard rather than advance the public policy permeating Rule 52.11 by unduly deferring Western's right to adjudicate its claim against American. To yield to American's argument with respect to the prohibition contained in the "no-action" clause against "impleading" it would be tantamount to judicial recognition that parties may indiscriminately vary or forfeit procedural rules by contractual provisions. The end result would be to reduce the Rules of Civil Procedure to shambles and inject unfathomable confusion and uncertainty in the orderly presentation of justiciable matters which the rules are designed to serve. Any danger of prejudicially tainting the principal action with the actual or potential presence of liability insurance can be obviated by severing such third-party claims for separate trial. Rule 66.02. By way of final observation, permitting Western to proceed

---

**3.** Cf. *Kelso v. Kelso*, 306 S.W.2d 534, 540 (Mo. 1957) and *United States Guarantee Co. v. Liberty Mut. Ins. Co.*, 244 Wis. 317, 12 N.W.2d 59, 60–61 (1943), treating an insurer's denial of coverage and refusal to defend, albeit under different circumstances, as waiver of a "no-action" clause.

with its third-party claim against American does not bespeak of or permit a direct action by Heshion against American and the occasion of impleading an insurer arises only in those limited instances where an insurer has disclaimed coverage and refused to defend on behalf of its insured. American's first point is not well taken.

■ American's second point, that the trial court erred in denying its motion for severance, lends itself to being expeditiously disposed of by reason of the course of events which occurred. Western's third-party claim was disposed of by way of summary judgment and there is no indication from the record on appeal, nor from any hint or suggestion by American, that the jury which tried the principal action was ever advised of either its pendency or disposition. In a de facto sense, there was a severance and any prejudicial taint of the presence of liability insurance in the principal action tried to the jury was non-existent. American's second point affords no basis for relief.

American's third and final point, that the liability policy it issued to Western did not extend coverage to Heshion's claim, necessitates reference to certain policy provisions in order to be put in proper perspective. The "Insuring Agreement" in said liability policy, so far as here relevant, reads as follows: "To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages . . . because of . . . property damage . . . to which this policy applies, caused by an occurrence, and the company shall have the . . . duty to defend any such suit against the insured alleging such . . . property damage and seeking damages which are payable under the terms of this policy . . . ." Exclusion 1(4) in said liability policy, so far as here relevant, reads as follows: "This policy does not apply . . . to injury to or destruction, including loss of use of . . . any

automobile owned, maintained, hired or used by the insured except automobiles in the custody of the insured for safekeeping or storage . . . ."[4] The word "automobile" as used in the liability policy is defined, so far as here relevant, under paragraph A of "Additional Definitions" as follows: "The word 'automobile' means a land motor vehicle . . . designed for travel on public roads but does not include any vehicle . . . *maintained for use exclusively on premises owned by or rented to the named insured . . . .*" (Emphasis added.)

■ Certain time honored principles exist under the law of this state regarding insurance policies, among which are the following. In general, plain and unambiguous language in insurance policies is given its ordinary meaning and effect and construction is resorted to only where ambiguity exists. *Gossett v. Larson*, 457 S.W.2d 709, 712–13 (Mo.1970); *State ex rel. State Depart. of P. H. & W. v. Hanover Ins. Co.*, 431 S.W.2d 141, 143 (Mo.1968); *Packard Mfg. Co. v. Indiana Lumbermens Mut. Ins. Co.*, 356 Mo. 687, 203 S.W.2d 415, 416 (banc 1947); and *Bennett v. American Life & Accident Ins. Company*, 495 S.W.2d 753, 757 (Mo.App.1973). An ambiguity exists where the language used is reasonably susceptible of two interpretations. *English v. Old American Insurance Company*, 426 S.W.2d 33, 36 (Mo.1968); and *Brugioni v. Maryland Casualty Company*, 382 S.W.2d 707, 710–11 (Mo.1964). If the language used is found to be ambiguous it will be strictly construed against the insurer and in favor of the insured, and this is especially true when the clause in question attempts to limit or exclude coverage under the policy. *Aetna Casualty & Surety Company v. Haas*, 422 S.W.2d 316, 321 (Mo.1968); and *Meyer Jewelry Co. v. General Insurance Co. of Amer.*, 422 S.W.2d 617, 623 (Mo.1968). Moreover, an insurance policy is to be construed as a whole, insofar as it may be open to differ-

4. American has tacitly conceded coverage if Exclusion (1)4 does not apply and this opinion confines itself to the narrow issue presented. Moreover, Western does not contend that the Rolls Royce was in its "custody . . . for safekeeping or storage" so as to render Exclusion (1)4 inapplicable.

ent constructions, and the construction most favorable to the insured must be adopted. *Wendorff v. Missouri State Life Ins. Co.,* 318 Mo. 363, 1 S.W.2d 99, 101–02 (1927); and *Meyers v. Smith,* 375 S.W.2d 9, 16–17 (Mo.1964).

■ At first blush, Exclusion (1)4, *supra,* would appear to exclude coverage for Heshion's claim. However, the definition of "automobile" under paragraph A of "Additional Definitions", *supra,* that the word "automobile . , . does not include any vehicle . . . maintained for use exclusively on premises owned by or rented to the named insured" appears to be cast in "plain" and "unambiguous" language and under the facts at hand the Rolls Royce did not fall within the definition of an "automobile" as that term is employed in Exclusion (1)4, *supra.*[5] Even if the definition of "automobile" and the language employed in Exclusion (1)4 be deemed ambiguous, resort to the reigning principles appertaining to insurance policies heretofore referred to would compel a finding that Exclusion (1)4 does not exclude coverage for the claim asserted by Heshion. Without indulging in facetiousness, it may well come as a shock to car-buffs that the Rolls Royce in question was not an "automobile" on the occasion in question. American's third point is devoid of merit.

Western's motion for an allowance of additional attorney fees and costs incurred on appeal regarding both its appeal from the judgment obtained by Heshion in the principal action and its resistance of American's appeal in the third-party action is next in line for disposition.

■ Resolution of Western's claim for additional attorney fees and attendant expenses incurred in connection with *American's appeal* calls into play the well established principle that in an action on an insurance policy, as in other civil actions, attorney fees are not recoverable by a successful insured-litigant in an action against his insurer in the absence of a statute or

contractual agreement making provision for them. 46 C.J.S. Insurance § 1405 b, p. 712. Western's present claim for an allowance of attorney fees and certain other attendant expenses incurred in resisting American's appeal from the summary judgment is to be distinguished from Western's claim for and recovery of reasonable attorney fees and attendant expenses incurred in defending the principal action occasioned by American's ill founded denial of coverage and refusal to defend Western in the principal action.

■ Western has failed to point out and this court has been unable to find any contractual provision in the liability policy to support its claim for the recovery of attorney fees incurred in resisting American's appeal. It is also significant that Western made no claim whatsoever at the trial court level for the recovery of attorney fees and attendant expenses incurred in pursuing its third-party action against American predicated on American's repudiation of coverage and refusal to defend Western in the principal action. The only statute mentioned by Western in its motion before this court for an allowance of attorney fees and attendant expenses incurred in resisting American's appeal is an oblique reference to Section 375.420, RSMo 1978, absent any pleading or facts being adduced, below or on appeal, that American's conduct was "vexatious" within the purview of said statute or otherwise. In view of this pleading and evidentiary void, it is unnecessary to decide whether Section 375.420, *supra,* was otherwise applicable and this court expressly refrains from doing so. In reality, Western's vague reference to Section 375.420, *supra,* seeks to broach a new cause of action for the first time on appeal by its motion for an allowance of attorney fees and attendant expenses incurred in pursuing its claim against American on the policy of liability insurance. It may summarily be said that such will not be countenanced. Parenthetically, it is observed that Western does not plead or contend that it is entitled

---

**5.** American does not contend that the Rolls Royce was not "maintained for use exclusively on premises owned by or rented to" Western at the time it was damaged.

to attorney fees incurred in resisting American's appeal from the summary judgment entered in the third-party action by way of damages under Rule 84.19 because American's appeal was frivolous. Having failed to demonstrate or convince this court of the existence of any contractual provision or applicable statute or rule to base its plea for an allowance of attorney fees and attendant expenses incurred in resisting American's appeal, Western's motion in this particular respect is denied.

The final aspect of Western's motion, allowance of additional attorney fees and certain attendant expenses against American on appeal incurred by reason of Western's appeal from the judgment rendered against it and in favor of Heshion in the principal action, presents a far more vexing question. *Landie v. Century Indemnity Company*, 390 S.W.2d 558, 562 (Mo. App.1965), states that "the universal rule which Missouri follows is that an insurance company is liable to the limits of its policy plus attorney fees, expenses and other damages where it refuses to defend an insured who is in fact covered . . . [and] [t]his is true even though the company acts in good faith and has reasonable ground to believe there is no coverage under the policy." The "universal rule" expressed in *Landie* was in the context of attorney fees incurred at the trial court level, and not, as here, in the context of seeking recovery for additional attorney fees incurred on an appeal taken by an insured from an adverse judgment rendered in favor of an injured party where the insurer denied coverage and refused to defend. The allowance of additional attorney fees incurred on appeal by an insured against an insurer in the context at hand has not been directly confronted in this state, nor in any other state, according to this court's independent research. The only Missouri case which even tangentially touches the issue appears to be *Centennial State Bank v. S.E.C. Construction Co., Inc.*, 518 S.W.2d 143 (Mo.App. 1974). There, the insureds, on appeal, via a motion in the appellate court, were allowed a reasonable attorney's fee against their insurer, who had denied coverage and refus-

ed to defend, for legal services incurred in successfully resisting an appeal by an injured party who failed to obtain a judgment at the trial court level. It is readily apparent that *Centennial State Bank* is distinguishable from the present situation. Heshion, the injured party, rather than Western, the insured, was the successful litigant at the trial court level in the principal action. On appeal Western's position is that of unsuccessfully seeking to reverse the judgment rendered against it and in favor of Heshion in the principal action rather than resisting an appeal by Heshion from a judgment in favor of Western and against Heshion. By reason of these distinguishing features, *Centennial State Bank* neither conclusively answers the precise issue at hand nor does it foreclose further inquiry. The holding of the trial court in *Grand Union Co. v. General Accident, Etc., Assur. Corp.*, 254 App.Div. 274, 4 N.Y.S.2d 704 (1938), *affirmed*, 279 N.Y. 638, 18 N.E.2d 38 (1938), is highly apposite at this point. There an insured in an action against its insurer on a policy of liability insurance was awarded reasonable attorney fees and costs incurred both in defending itself at the trial court level and in prosecuting a successful appeal from a judgment rendered against it and in favor of the injured party where its insurer had denied coverage and refused to defend. Having found that there was coverage under the applicable policy of insurance the trial court, with reference to the allowance of attorney fees and costs incurred at both the trial and appellate levels, held as follows, 4 N.Y.S.2d at 711: "The accident being within the coverage defendant [insurer] was obligated to defend and having refused to do so is liable to plaintiff [insured] for damages caused by its [insurer's] failure to defend. In considering the quantum of damages it must be kept in mind that plaintiff's [insured's] right of action herein is not founded on defendant's [insurer's] agreement *to indemnify* nor on its [insurer's] additional agreement to pay the costs taxed against plaintiff [insured] in actions defended by the insured. Plaintiff [insured] here

is suing for defendant's [insurer's] breach of an entirely separate agreement, viz., the express covenant *to defend.* In such case plaintiff's [insured's] damages are the expenses reasonably incurred by it in defending the Ford action *after* defendant's [insurer's] refusal to do so. *Such damages include the expense of appeals as well as trials, at least where there are reasonable grounds for appeal* [emphasis added] and here there were such grounds since plaintiff's [insured's] appeals resulted in the final dismissal of the Ford complaint." In so holding the trial court in *Grand Union Co.* proceeded on the theory that an insured was entitled to recover reasonable attorney fees and other expenses from its insurer incurred on appeal as well as on trial where the insurer breached its contractual duty to defend if "reasonable grounds" for an appeal existed. Determination of the existence of "reasonable grounds" for an appeal was easily resolved in *Grand Union Co.* by reason of the insured's successful prosecution of an appeal from a judgment obtained against it by the injured party. In the instant case Western has been unsuccessful in its appeal from the judgment obtained against it by Heshion in the principal action. Does Western's unsuccessful appeal, ipso facto, force the conclusion that Western had no "reasonable grounds" for an appeal? If this question is answered in the affirmative, then doing so would be tantamount to holding that "reasonable grounds" for an appeal are non-existent in every unsuccessful appeal regardless of the nature of the case, the issues tendered on appeal, and the presence or lack of definitive authority. The law is not well served by blindly cutting with mechanical strokes. This court concludes that determination of the existence or non-existence of "reasonable grounds" for an appeal cannot be reduced to a rote function and turn solely on whether an appealing party has been successful or unsuccessful at the appellate level. Otherwise, reason and logic would be excluded from making such a critical determination. In the instant case Western, to indulge in a well known colloquialism, was caught "betwixt a rock and a hard place". American had denied coverage and refused to defend Western in the principal action brought by Heshion which resulted in an adverse judgment against Western and American had appealed the summary judgment rendered in favor of Western and against American in the third-party action. This court cannot say with a firm conviction that Western had no "reasonable grounds" for an appeal in the principal action, notwithstanding the fact that it was unsuccessful in its appeal. If for no other reason the judicially recognized uncertainty and confusion surrounding bailment actions in this state, *Nuell v. Forty-North Corporation, supra,* and *Broadview Leasing Co. v. Cape Central Airways, Inc., supra,* permeated in varying degrees the points raised by Western in its appeal in the principal action. It is also significant that neither Heshion nor American contend that Western's appeal in the principal action was vexatious, frivolous, in bad faith or devoid of reasonable grounds. American's failure to do so may very well be said to imply that it would have appealed on Western's behalf if it had assumed defense of the principal action. Moreover, Heshion's brief as respondent on appeal demonstrates that it did not view the grounds raised by Western on appeal as being legally "cut and dried". Instead, it recognized them as presenting viable and arguable issues under the existing case law of this state. Everything considered, this court is constrained to hold that Western is entitled to recover additional attorney fees and certain attendant costs from American incurred by Western by virtue of its appeal in the principal action even though it was unsuccessful in obtaining a reversal of the judgment rendered in favor of Heshion.

Western filed an affidavit in this court in support of its motion for additional attorney fees and certain attendant costs incurred in connection with its appeal in the principal action ostensibly substantiating an allowance of additional attorney fees in the amount of $1,896.69 and attendant costs of $306.00 which it paid for preparation of that portion of the transcript on appeal

relative to the principal action and $172.50 which it paid for printing its brief as appellant in the principal action. The amount claimed for additional attorney fees was computed on the basis of an average hourly rate of $40.00 per hour, give or take a few cents. American in its suggestions filed in opposition to Western's motion for additional attorney fees and certain attendant costs incurred by Western in its appeal in the principal action contends that certain charges appertaining to attorney fees overlap and that the overall amount claimed is unreasonable. The only overlapping or questionable charges found by this court are relatively insubstantial and at best involve no more than $340.00 in charged time. As held in *Centennial State Bank v. S.E.K. Construction Co., Inc., supra,* 518 S.W.2d at 151, citing *Cascio v. Cascio,* 485 S.W.2d 857 (Mo.App.1972), " '[(t)he] courts are themselves experts on the subject of attorneys' fees, . . . and this expertise extends to the value of appellate services'. . ." Everything considered, this court holds that Western is entitled to recover an additional attorney's fee in the amount of $1,555.00 and attendant costs in the amount of $478.50 incurred by reason of its appeal in the principal action.

 The judgment of the trial court in the principal action in favor of Heshion and against Western is affirmed. The judgment of the trial court in the third-party action in favor of Western and against American is affirmed but remanded to the trial court with the following directions. The trial court is directed to enter an additional judgment in the third-party action in favor of Western and against American for reasonable attorney fees in the amount of $1,555.00 and attendant costs in the amount of $478.50 incurred by Western in its appeal in the principal action. Under the "Insuring Agreement" American contractually agreed "[t]o pay on behalf of insured [Western] all sums which the insured [Western] shall become legally obligated to pay as damages . . .". For this reason the trial court is directed to further amend said judgment rendered in favor of Western and against American in the third-party action

by inclusion of a provision that American's satisfaction of the judgment obtained by Heshion against Western in the principal action shall constitute, to the extent of the amount paid in satisfaction of the judgment in favor of Heshion and against Western in the principal action, partial satisfaction of the judgment rendered in favor of Western and against American in the third-party action.

All concur.